**Joleen L. SIDER**

v.

**BOROUGH OF WAYNESBORO,**
**Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 4, 2007.

Decided Oct. 4, 2007.

C. Kent Price, Harrisburg, for appellant.

James M. Stein, Waynesboro, for appellee.

BEFORE: McGINLEY, Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

The Borough of Waynesboro (Borough) appeals from a decision of the Court of Common Pleas of the 39th Judicial District of Pennsylvania, Franklin County Branch (trial court) which denied the Borough's motion for post-trial relief and further denied the Borough's motion for a new trial. The only issue before this court is whether or not the loss of a cognitive function of the brain as a result of an injury to the brain is loss of a bodily function under Section 8553 of the Judicial Code, 42 Pa. C.S. § 8553(c)(2)(ii).[1] We hold that it is and affirm the trial court.

On July 15, 2001, Joleen L. Sider (Sider) was using a swing that was part of a four swing swing-set at Memorial Park in the Borough. The park and the various pieces of playground apparatus located thereon are owned by the Borough. The swing-set was constructed of metal pipes with legs at each end and in the middle. Such legs were encased in three-foot deep poured concrete. As Sider was using a swing, the metal cross-member, to which the chains supporting the swing were attached, broke, causing Sider to fall to the ground where she was ultimately struck in the head by the metal cross-member. On August 11, 2003, Sider filed a complaint on a theory of negligence seeking monetary damages for her injuries.[2]

---

1. Cognitive function was described by the Borough's expert witness as "your thinking abilities, what are the abilities that you use to think, to process information, to bring in information, to process short-term memory, long-term memory, how fast you process information, variety of the different forms of thinking." Notes of Testimony of Ruben Echemendia, Ph.D., February 15, 2007, at 10–11.

2. The Borough is a "local agency" entitled to governmental immunity pursuant to what is commonly known as the Political Subdivision Tort Claims Act (Act), 42 Pa.C.S. §§ 8541–8542, unless one or more of the enumerated

■ On February 16, 2006, a jury found the Borough negligent in the maintenance of the swing-set and awarded damages in the aggregate amount of $500,000.00 to Sider. Thereafter, the Borough filed a motion for post-trial relief, Sider filed a motion for delay damages, and, at a later date, the Borough amended its motion for post-trial relief. On March 9, 2007, the trial court denied the Borough's amended motion for post-trial relief, molded the verdict to $490,745.00, excluding $9,246.00 of medical expenses and awarded delay damages to Sider in the amount of $93,341.62. The Borough now appeals to our court.[3]

■ The Borough contends that Sider is not entitled to recover damages for pain and suffering as established by Section 8553 of the Judicial Code, 42 Pa.C.S. § 8553(c)(2)(ii), because she did not suffer the permanent loss of a bodily function. Specifically, the Borough states that the evidence at trial was that Sider had suffered a permanent loss of certain cognitive functions, i.e. memory and concentration, and that cognitive functions do not qualify as bodily functions for the purpose of entitlement to pain and suffering damages under Section 8553.

Section 8553 of the Judicial Code, 42 Pa.C.S. § 8553(c), provides in pertinent part as follows:

(c) Types of losses recognized.—Damages shall be recoverable only for:

. . .

(2) Pain and suffering in the following instances:

. . .

(ii) only in cases of **permanent loss of a bodily function,** permanent disfigurement or permanent dismemberment where the medical and dental expenses referred to in paragraph (3) are in excess of $1,500.

(Emphasis added). The Borough contends that the word "bodily" should be considered synonymous with the word "physical." A "permanent loss of a bodily function" has been defined by our Supreme Court in *Walsh v. City of Philadelphia,* 526 Pa. 227, 241–42, 585 A.2d 445, 452 (1991), as meaning "that as a proximate result of the accident, the injured claimant is unable to do or perform a bodily act or bodily acts which the claimant was able to do or perform prior to sustaining the inju-

exceptions apply. At trial, it was conceded that the "real property" exception applies to this matter. The Act provides in pertinent part as follows:

(a) Liability imposed.—A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter. . . .

* * *

(b) Acts which may impose liability.—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

* * *

(3) Real property.—The care, custody or control of real property in the possession of the local agency, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in

the possession of the local agency. As used in this paragraph, "real property" shall not include:

(i) trees, traffic signs, lights and other traffic controls, street lights and street lighting systems;

(ii) facilities of steam, sewer, water, gas and electric systems owned by the local agency and located within rights-of-way;

(iii) streets; or

(iv) sidewalks.

42 Pa.C.S. § 8542(b)(3).

3. Our review of the trial court's denial of a motion for post-trial relief is limited to determining whether the trial court abused its discretion or committed an error of law. *Pikur Enterprises, Inc. v. Department of Transportation,* 163 Pa.Cmwlth. 251, 641 A.2d 11, petition for allowance of appeal denied, 539 Pa. 657, 651 A.2d 543 (1994).

ry and that the loss of such ability is permanent."

In the present controversy, Elaine Mac-Niven, Ph.D., a psychologist, testified on behalf of Sider regarding two reports she had authored.[4] In her first report, Dr. MacNiven described Sider's injury as a "right hemisphere brain dysfunction." Net Work Niagara, Neuropsychological Assessment Report of Dr. E. MacNiven, Psychologist, E. Ward, M.A., May 22, 2002 (Report) at 29. "There were also pathognomonic signs of brain damage, including anomia . . . , limited flexibility of thinking, borderline working memory, and an impairment on the Trail Making Test, Part B, (which is suggestive of some left hemisphere compromise). All of these neuropsychological signs are indicative of brain damage. The localization of damage is to the right hemisphere, but mildly in the left hemisphere."[5] Report at 29. The Report also stated that "the initial CT scan showed a hemorrhage in the left Sylvian region and a possible left temporal contusion. There was also evidence of a right temporal skull fracture and a hematoma in the right anterior temporal parietal area." Report at 30.

Dr. MacNiven also stated in her Report that "it is clear that Ms. Sider suffered a head injury as a result of the fall. Ms. Sider's results on a test of personality style and emotional functioning did not show the presence of possible interfering factors, such as depression, anxiety, pain, or fatigue that could have contributed to the present results. The results are considered to be indicative of reduced functioning associated with organic brain damage." Report at 30. Dr. MacNiven further opined in her report as follows:

The present test results indicate that Ms. Sider is suffering from sufficient cognitive impairments to affect her ability to function in the workplace, or any environment, when she is presented with multiple pieces of information. She has difficulty mentally working with more than one piece of information at a time. She has trouble dividing her attention between events or stimuli, and she has problems efficiently alternating her attention. She also showed significant difficulties with regard to her memory, which will undoubtedly impact on all areas of functioning. There were also mild impairments with regard to problem solving and reasoning that could compromise her ability to function normally on a daily basis. As mentioned previously, there should be some ongoing improvement over time, but there is a moderate likelihood that there will be some subtle to mild impairments that will be present on a permanent basis that could cause subtle effects on her functioning over the long term.

Report at 31.

Dr. MacNiven again examined Sider on September 3, 2003, and issued a second report in which she determined that Sider had improved cognitive functions but that she "continues to show variable attention, as well as difficulties problem solving under novel situations and she also shows mildly inflexible thinking." Dr. MacNiven further reported that she did not expect any further significant changes in Sider and that Sider "will likely be left with mild weaknesses in attention and executive

4. Sub judice, the competence and credibility of Dr. MacNiven's testimony are not an issue.

5. Pathognomonic is defined as "[c]haracteristic or indicative of a disease; denoting especially one or more typical symptoms, findings, or pattern of abnormalities specific for a given disease and not found in any other condition." Stedman's Medical Dictionary 1312 (26th ed. 1995).

functions." Dr. MacNiven Neuropsychological Assessment Report, September 3, 2003 (2003 Report), at 16.

The Borough requests that we reverse the trial court and determine that the trial court erred in failing to determine that brain function is not a bodily function. The Borough relies upon *Zerr v. Erie Insurance Exchange*, 446 Pa.Super. 451, 667 A.2d 237 (1995), for its contention that a bodily injury does not include mental illness. This case is distinguishable from the present controversy, as Sider is not claiming a mental illness, but a physical injury to her head.[6] The Borough further relied upon *Needleman v. Liberty Mutual Fire Insurance, Co.*, 352 Pa.Super. 288, 507 A.2d 1233 (1986). In *Needleman*, a child was killed when struck by an automobile in front of her house and her death was witnessed by her family members. The family members filed an action seeking compensation for psychiatric and psychological care due to witnessing the death. The Superior Court determined that the family members who witnessed the accident were not "victims" and did not suffer an "injury" as defined under the old no-fault motor vehicle insurance act. Thus, *Needleman* is also distinguishable, as the family members did not suffer any physical injury, as Sider did in the present controversy.

In attempting to define "bodily function", we find that the term "bodily" is defined as "of or relating to the body." Webster's Third New International Dictionary 245 (1986). The term "body" is defined as "the total organized physical substance of an animal or plant:" the aggregate of tissues: the physical organism: as (1) the material part or nature of man ... (3) the person of a human being.... *Id.* at 246. "Function" is defined as "the normal and specific contribution of any bodily part (as a tissue, organ, or system) to the economy of a living organism." *Id.* at 921. The "brain" has been defined as "the portion of the vertebrate central nervous system that constitutes the organ of thought and neural coordination, including all the higher nervous centers...." *Id.* at 266. Our Supreme Court in *Commonwealth v. Alexander*, 477 Pa. 190, 194, 383 A.2d 887, 889 (1978), confirmed that the head is "a very vital part of the human body." Thus, the brain is a "material part" of man and when physically injured, fits the definition of a "bodily injury."[7]

It is difficult to understand the Borough's contention which basically is that those functions of the brain, which are described as cognitive functions, e.g. thinking, memory, reasoning, problem solving, etc., are not functions of the body. Where reactions such as fear, depression, anxiety, etc., may sometimes be attributable to purely emotional psychological distress unrelated to bodily harm, here the evidence proved to the satisfaction of the jury that Sider's brain was physically damaged causing a loss of brain functions which prevent the brain from functioning as it did before this accident.

6. In *Zerr*, Ralph Zerr was traveling in his car on the Pennsylvania Turnpike when, allegedly, he had to swerve in order to miss hitting a tractor trailer that was changing lanes too quickly. Zerr proceeded off the turnpike before coming to a stop. The vehicles never made contact with each other and Zerr was not injured physically. Zerr filed a claim with his automobile insurance company contending that "bodily injury" includes mental illness manifested by physical symptoms. We agreed with the trial court that "bodily injury" does not include mental illness. That "his injury did not result in an illness, but rather his illness resulted in a bodily injury." *Id.* 667 A.2d at 239.

7. "Bodily injury" has been defined as "[p]hysical damage to a person's body." Black's Law Dictionary 801 (8th ed.).

Sider suffered an injury to her brain which resulted in permanent weaknesses in attention and executive functions. Sider never claimed that she had a psychological injury or emotional distress. Thus, as a physical injury differs from a mental injury, and Sider received a physical injury which resulted in brain damage, including loss of cognitive functions, not psychosis, the trial court was correct in its determinations.

Accordingly, we must affirm the decision of the trial court.

## ORDER

AND NOW, this 4th day of October, 2007 the order of the Court of Common Pleas of the 39th Judicial District of Pennsylvania, Franklin County Branch in the above-captioned matter is affirmed.